**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

MEXICHEM FLUOR, INC.

VERSUS

ACE STORAGE, INC., ET AL.

CIVIL ACTION

NO. 13-00141-SDD-RLB

## RULING

Before the Court is Plaintiff Mexichem Fluor, Inc.'s *Motion for Partial Summary Judgment on Liability as Depositary Under Louisiana Law*.[1] Defendant, Ace Storage, Inc., has filed a *Memorandum in Opposition*.[2] In its *Memorandum in Response to Defendant's Rule 60(B) Motion and in Support of Motion for Summary Judgment*, Mexichem responded to Ace's opposition memorandum.[3] For the following reasons, Mexichem's Motion shall be granted.

**I.  FACTS AND PROCEDURAL HISTORY**

For eleven years, Mexichem[4] stored some 36-37 pallets of chemicals including refrigerants known as R22, R134a, and R410A, in Ace's warehouses on River Road.[5] Mexichem paid Ace approximately $472,000.00 in storage fees. Due to limited supply, Mexichem's chemicals were extremely valuable, thus presenting a substantial theft risk.[6] Between April of 2010 and October of 2011, Ace relocated some of Mexichem's

---

[1] Rec. Doc. 32.
[2] Rec. Doc. 35-2.
[3] Rec. Doc. 36. To the extent Mexichem's response addressed Ace's opposition memorandum, the Court treats Mexichem's response as a reply brief.
[4] Mexichem's predecessor company, INEOS Fluor Americas, LLC, originally stored the chemicals in Ace's warehouse. Rec. Doc. 27, pp. 2-3. INEOS assigned its rights to Mexichem as to the May 2001 storage contract with Ace. Rec. Doc. 1, pp. 3-4; Rec. Doc. 1-4; Rec. Doc. 24, p. 2; Rec. Doc. 31, p.2.
[5] Rec. Doc. 1, pp. 3 and 7.
[6] Rec. Doc. 1, p. 7; Rec. Doc. 32-6, 26-27; Rec. Doc. 32-7, p. 2.

chemicals to another Ace facility.[7] As part of the moving process, Ace conducted an inventory of Mexichem's products on October 24, 2011 and discovered that large quantities of Mexichem's chemicals were missing.[8] One week later, Ace informed Mexichem about the missing chemicals.[9] Since their disappearance, Ace has been unable to locate the missing chemicals, and Mexichem denies ever receiving or removing them.[10] After Ace refused to replace the chemicals or provide compensation equitable to the amount of chemicals lost, Mexichem filed this federal lawsuit on March 6, 2013 against Ace and its insurer, Essex Insurance Company, based on diversity jurisdiction.[11] Mexichem claims that, under Louisiana law, Ace breached its duty as Mexichem's depositary and also breached the parties' contract. Ace denies fault.[12] Mexichem moves for partial summary judgment urging Ace's liability as a depositary under Louisiana law.

## II. LAW

### A. Plaintiff's Motion for Partial Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[7] Rec. Doc. 1, p.4; Rec. Doc. 36-2, pp. 2-3.
[8] Rec. Doc. 1, p. 4.
[9] Rec. Doc. 1, p. 4. Ace informed Mexichem about the missing chemicals and related inventory report on November 1, 2011. Rec. Doc. 36-1, p. 2.
[10] Rec. Doc. 1, p. 6. Rec. Doc. 32-4, p. 12.
[11] Rec. Doc. 1. Mexichem subsequently filed an *Amended and Restated Complaint* on July 1, 2013. Rec. Doc. 24, p. 4; Rec. Doc. 31, p. 4.
[12] Rec. Doc. 24; Rec. Doc. 31; Rec. Doc. 32-4, p. 13; Rec. Doc. 32-5, p. 1. Mexichem is a Delaware Corporation that owns and operates a chemical plant in St. Gabriel, Louisiana, and has its principal place of business in Tlalnepantla de Baz, Mexico. Rec. Doc. 27, p.1. Ace is a Louisiana corporation that operates a storage facility in Baton Rouge, Louisiana, and has its principal place of business in Baton Rouge, Louisiana. Rec. Doc. 31, p. 2. Essex is a non-Louisiana insurance company that writes policies for coverage in the State of Louisiana.

matter of law."[13]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[14]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[15]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[16]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[17]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[18]  All reasonable factual inferences are drawn in favor of the nonmoving party.[19]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[20]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the

---

[13] Fed.R.Civ.P. 56(a).
[14] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, at 398-99 (5th Cir. 2008).
[15] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, at 494 (5th Cir. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, at 323-25, 106 S.Ct. at 2552)).
[16] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, at 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[17] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, at 315 (5th Cir. 1995) )(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[18] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[19] *Galindo v. Precision American Corp.*, 754 F.2d 1212, at 1216 (5th Cir. 1985).
[20] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, at 857 (5th Cir. 2010).

plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint.""[21]

### B. Louisiana's Law Regarding Depositary

Pursuant to article 2926 of the Louisiana Civil Code, "[a] deposit is a contract by which a person, the depositor, delivers a movable thing to another person, the depositary, for safekeeping under the obligation of returning it to the depositor upon demand." In order to create a contract of deposit, there must be an agreement and the delivery, or the actual transfer, of the thing to the depositary.[22] There are two types of deposits: a gratuitous deposit, where the depositary is not compensated, and an onerous deposit, where the depositary is paid for the services it provides.[23] "[U]nder La. Civil Code Art. 2930, a gratuitous depositary need only exercise that degree of care that it takes for his own property, while an onerous depositary must proceed with diligence and prudence."[24] "An onerous depositary owes a duty to exercise reasonable care and to take precautions against reasonably foreseeable danger to deposited property,"[25] but he is not an insurer of the deposit.[26] "When a deposit is not returned as made, a presumption arises of the depositary's negligence or fault, and the depositary has the burden to show that the loss or damage to the deposit was occasioned other than by his

---

[21] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, at 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
[22] La. C.C. art. 2929. Comment C to La. C.C. art. 2929 provides that "[t]he word 'delivery' in Article 2929 signifies the transfer by the depositor to the depositary of the physical control of a corporeal movable."
[23] La. C.C. art. 2928.
[24] *Schaefer v. Paretti Imports, Inc.*, 997 So.2d 619, at 621 (La.App. 5 Cir. 10/28/08). La. C.C. art. 2930 was enacted in 2003.
[25] *Dollar Thrifty Auto Group, Inc. v. Bohn-DC, L.L.C.*, 23 So.3d 301, at 303-04 (La.App.5 Cir. 9/30/08).
[26] *Broussard v. Paul Fournet Air Service, Inc.*, 574 So.2d 541, at 542 (La.App. 3 Cir. 1991).

own negligence."[27] Regardless of the type of deposit, "the depositary is liable for the loss that the depositor sustains as a result of the depositary's failure to perform such obligations."[28]

## III. ANALYSIS

The parties do not dispute that a contract of deposit existed between them.[29] Nor do the parties dispute the fact that Mexichem's chemicals were stored at Ace's warehouse and that Mexichem's chemicals went missing.[30] It is also undisputed that Ace has not reimbursed Mexichem for the loss of the chemicals.[31] As an onerous depositary, Ace is held to a higher standard than that of a gratuitous depositary. Because Mexichem's deposit has not been returned, and because the chemicals have been lost or stolen while in Ace's care as the depositary, Ace must rebut the legal presumption that it is liable due to negligence or fault.

Although Ace contends it acted reasonably in safeguarding Mexichem's property through the use of these security measures to guard against theft at its warehouse, even resolving all reasonable factual inferences in favor of Ace, the evidence does not support a finding of reasonableness. It is undisputed that Ace was aware that the subject chemicals were valuable and known to be "a very high theft item"; nevertheless, no precautionary measures were taken. The chemicals were not stored in any safer

---

[27] *Schaefer v. Paretti Imports, Inc.*, 997 So.2d 619, at 621 (La.App. 5 Cir. 9/30/08). See also, *Harper v. Brown & Root, Inc.*, 391 So.2d 1170, 1173 (La. 1980). (Louisiana jurisprudence is clear that "[o]nce the depositor establishes the existence of a deposit and the loss of the property while deposited, it is presumed that the loss resulted from the depositary's lack of care, and the depositary has the burden to exonerate himself from fault.").
[28] La. C.C. art. 2930
[29] Rec. Doc. 32-4, pp 10-11. Ace admitted to signing the contract to store Mexichem's chemicals. Rec. Doc. 32-4, p.10.
[30] Rec. Doc. 32-4, p. 12. Rec. Doc. 32-7, p. 3.
[31] Rec. Doc. 32-4, p. 13.

area within the warehouse, and no additional security precautions were taken.[32] In fact, Ace's owner testified that the company does not take any special precautions for securing more valuable items, although he admitted it could be done.[33] Ace did not conduct self-initiated, in-house inventories of Mexichem's products to ensure there was no unexplained loss.[34]

At the time Mexichem's products were stored at Ace's warehouse, the security system in place consisted of two external video cameras and a Sonitrol alarm system. Although the owner of Ace testified that he installed the cameras, he sought no outside, expert guidance in their placement.[35] While the cameras were intended to monitor the external areas of the property and deter theft, Ace's owner admitted that the cameras had limited coverage of the exterior and there was no video surveillance inside the Ace facility.[36] According to Ace, when tractor trailers were parked to load and off-load materials, the cameras' view of other loading and unloading areas was sometimes obscured.[37] For instance, if a trailer was in parked front of the first door on the south side of the warehouse, surveillance of the other three loading doors on the south side was obstructed.[38] Nevertheless, the cameras were not repositioned.

---

[32] Rec. Doc. 32-6, p. 6; Rec. Doc. 36-2, p.2.
[33] Rec. Doc. 32-7, p. 13.
[34] Rec. Doc. 36-2, pp. 4-5. Kim Hunt, former Ace employee, further explained that "[t]he only time we did a physical count was … when Mexichem ordered one, and they would send … a representative from their facility and we could count together."
[35] When asked how about how he determined where to place the cameras, he responded: "Just from, just wanting to -- just to have the outside monitored in case somebody come to take something or break in." Rec. Doc. 36-1, p. 4.
[36] Rec. Doc. 36-1, pp. 3-4. For instance, Ace's owner testified that in "certain areas, if a trailer was in the way, it would block your view of them."
[37] Rec. Doc. 36-1, p. 4.
[38] Rec. Doc. 36-1, p. 4.

Ace acknowledged that a forklift and an 18-wheeler would have been necessary to move the large quantity of Mexichem's chemicals that went missing.[39] Yet, Ace knew that its security cameras could not be relied on to accurately monitor the loading and unloading activity.[40]

Additionally, the two exterior video cameras used by Ace had only a 30 day video storage capacity.[41] Ace's owner testified that when he installed the cameras he considered using a new video-tape every 30 days; however, the protocol was not implemented. Instead, every 30 days, the video tapes recorded over prior video.[42] Finding no unusual activity on its tapes, Ace presumes that the theft of Mexichem's chemicals happened more than 30 days prior to discovery of the loss.[43]

As for the internal areas of the warehouse, there were no video cameras in use.[44] When asked why there were no cameras inside the warehouse, Ace's owner offered the conclusory statement that it was "just not the norm for warehousing."[45] Ace offered no factual basis or other substantiation for its owner's opinion as to warehouse "norms". Essentially, Ace relied on an alarm system to provide security for the interior of the

---

[39] Rec. Doc. 36-1, p. 2; Rec. Doc. 32-7, p. 5.
[40] Rec. Doc. 36-1, p. 4. Ace's owner testified with the cameras you could not see the activity going on inside of the trucks, such as the forklift driving onto the truck with the product it was carrying.
[41] Smith testified that at the time the cameras were installed he questioned this process, acknowledging that new tapes could have been purchased and put in for recording every thirty days. Rec. Doc. 32-7, p. 8.
[42] Rec. Doc. 32-7, p. 8; p. 9.
[43] Ace's owner testified that after his employees' reviewed the video tapes "[t]hey couldn't find nothing. That's why we was assuming that it was 30 days prior to that, that it had been past the 30 days prior to the day that we discovered it." Rec. Doc. 32-7, p. 8.
[44] Rec. Doc. 36-1, p. 3. Ace's owner testified: "Nothing in the building, nothing. Everything was outside for security, other than the alarm. When we locked the doors, we turned the alarm … on – but other than that, the cameras were outside. Nothing inside."
[45] Rec. Doc. 32-7, p. 12.

warehouse, which was only activated when the last employee left the warehouse.[46] When employees were in the warehouse, the alarm system was turned off because it was triggered by voices and the opening/closing of doors.[47] Notably, at the time of the Mexichem chemical theft, Ace's owner testified that its employees were working 24 hour days, 7 days per week. Hence, the alarm intended to secure the interior of the building was virtually never activated.[48]

Additionally, Kim Hunt, former Ace employee in charge of the Mexichem account, testified that, during the time period that Mexichem's chemicals disappeared, one of Ace's forklift operators reported to her that upon his arrival to work early one morning he discovered the roll-up doors (roll-up doors 1 and 2) where the Mexichem chemicals were stored had been left open and unattended.[49]

There were also times when there was damage to the physical structure of the warehouse that also damaged or affected the alarm system. In the event that the alarm company was unable to immediately repair the alarm system, Ace's employees would bypass the alarm system.[50] Kim Hunt further testified that, structurally, Ace's warehouse had a "fairly big" hole, large enough for a person to enter and exit, in the south end of the warehouse—where Mexichem's chemicals were stored--prior to and at the time Mexichem's chemicals were stolen. Additionally, Ace's owner testified that,

---

[46] Rec. Doc. 36-1, p. 2.
[47] Rec. Doc. 36-1, p. 6. Ace's owner testified that the alarm was voice and door activated.
[48] Rec. Doc. 36-1, p. 6. When specifically asked how the alarm was used considering the 24 hour days/shifts, Ace's owner stated that the alarm is "not set then. If somebody is in the building, you can't set it, because it's voice activated – it's voice and door, you know, openers on the door."
[49] Rec. Doc. 32-6, p. 7.
[50] Rec. Doc. 36-2, pp. 7-8. Rec. Doc. 36-2, p. 6.

with the exception of work release employees, "pretty much everybody knew the [alarm] code,"[51] and approximately 12 to 15 people had a key to get into the warehouse.[52]

In a nutshell, pallets of chemicals were apparently stolen while entrusted to Ace's care, custody and control. The theft of this quantity of chemicals would have required the use of a fork-lift and truck. Despite the fact that the chemicals were a known theft risk due to their value, external surveillance of the loading areas was incomplete and doors were reportedly left open and unattended at least once. Numerous employees had keys to the facility, and use of the internal alarm system was inconsistent at best. The alarm system was turned off much of the time and bypassed by employees other times. Structurally, the facility was unsecure by virtue of a large hole on the building's south side. Despite these shortcomings, Ace had no system to monitor the inventory levels of the chemicals it stored, such as a routine count of the number of pallets in inventory. Ace did not undertake any periodic review of the exterior surveillance cameras' video footage for suspicious activity. Hence, it was more than 30 days before Ace became aware of the fact that a substantial quantity of Mexichem's chemicals had apparently been stolen.

Applying Louisiana law and applicable jurisprudence to the facts before it, the Court finds that Ace has failed to overcome its burden of showing it was not negligent or that it took proper precautions to protect Mexichem's chemicals. In *Federal Ins. Co. v. C & W Transfer & Storage Co, Inc.*, the Louisiana Court of Appeal for the Fourth Circuit found the defendant-depositary, an Oriental rug cleaning company, failed to rebut the

---

[51] Rec. Doc. 36-1, p. 7.
[52] Rec. Doc. 36-1, p. 5.

presumption of fault in the theft of the plaintiffs' rugs.[53] The theft of the rug occurred sometime over the weekend. The owner of the company explained: "The theft was discovered and reported to him on a Monday morning…There were no signs of forcible entry. Security measures consisted of a fence with a barbed wire top surrounding the premises, securing the warehouse building every night, floodlights on the outside of each door of the building, and a patrol service which patrolled the area two or three times during the night."[54] The appellate court reasoned that while the proof showed the defendant took precautions to secure the area at night, aside from "testimony that the fence surrounds the premises the record is devoid of any evidence at all showing any security measures taken during the daytime."[55] The court concluded that because the theft could have occurred during the daytime—Saturday or Sunday—"defendants failed to carry their burden of proving [the defendant] was without negligence of fault and they are liable for the loss of the rug."[56]

In another appellate decision from the Louisiana Fourth Circuit, *Travelers Ins. Co. v. Coleman E. Adler, Inc.*, the court found that a jewelry store had acted reasonably by enlisting the expert advice and consultation of an alarm company for advice on its alarm system because it was concerned with the protection of its premises from theft and burglary.[57] The jewelry company installed all of the equipment recommended by its alarm company--"install[ing] a contact alarm system on its doors, windows, screens,

---

[53] 282 So.2d 563 (La.App. 4 Cir. 1973).
[54] *Id.* at 565.
[55] *Id.* at 566.
[56] *Id.*
[57] 285 So.2d 381 (La.App. 4 Cir. 1973).

vents and vault door."[58] The jewelry company's employee testified that he activated the alarm system at 6:00 pm before he left for the day, a few hours before the loss.[59] While the court took into consideration the fact that no alarm system is burglar proof, the effort taken by the jewelry store to attain the advice of an expert on its alarm system carried great weight. The appellate court also noted that when compared with four other jewelers in the area, it provided the greatest amount of effort to secure its customer's jewelry.

Unlike the depositary in *Travelers*, Ace sought out no expert guidance regarding the placement of its two video cameras, even though Ace knew that the cameras coverage was incomplete and sometimes obscured by routine activity.

Considering all of the evidence regarding Ace's security measures, the Court finds that Ace has not overcome its burden of showing that it was not at fault or negligent in the loss of Mexichem's chemicals.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Mexichem Fluor, Inc.'s *Motion for Partial Summary Judgment on Liability as Depositary Under Louisiana Law* is hereby GRANTED.[60]

Signed in Baton Rouge, Louisiana, on <u>May 16, 2014</u>

　　　　　　　　　　　　　　　*Shelly D. Dick*
　　　　　　　　　　　　　　　**JUDGE SHELLY D. DICK**
　　　　　　　　　　　　　　　**UNITED STATES DISTRICT COURT**
　　　　　　　　　　　　　　　**MIDDLE DISTRICT OF LOUISIANA**

---

[58] *Id.*, at 383.
[59] *Id.*
[60] Rec. Doc. 32.